UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| KATHLEEN M. RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:13-CV-211-JD-JEM |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security , | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

On June 14, 2013, Plaintiff Kathleen M. Ramirez filed her Complaint in this Court

seeking review of the final decision of the Defendant Commissioner of Social Security

(Commissioner).  [DE 1.]  The Commissioner filed an Answer on December 17, 2013.  [DE 15.]

On February 18, 2014, Ramirez filed her opening brief [DE 23], to which the Commissioner

responded on April 29, 2014. [DE 26.] Ramirez filed a reply on May 22, 2014.  [DE 29.]

Accordingly, the matter is now ripe for decision.  Jurisdiction is predicated on 42 U.S.C. §

405(g).

## I.  Procedural History

Ramirez filed an application for supplemental security income (SSI) on May 24, 2010.

(Tr. 133-136.)  Her application was denied initially on August 10, 2010, and again upon

reconsideration on November 17, 2010.  (Tr. 72-76.)  On November 8, 2011, a hearing was held

before Administrative Law Judge Melody Paige.  (Tr. 40-71.)  On February 23, 2012, ALJ Paige

issued a decision denying the claim.  (Tr. 16-34.)  The Appeals Council denied a request for

review on April 18, 2013, making the ALJ's decision the final decision of the Commissioner.

(Tr. 1-3.)

## II. Facts

Ramirez was born on March 2, 1974 and was 37 years old on the date the ALJ rendered her decision. (Tr. 33, 133.) Ramirez alleges a disability onset date of January 25, 2008 for both physical and mental impairments, including bipolar disorder, depression, asthma, and migraine headaches. (Tr. 149-158.) The ALJ found that Ramirez's severe impairments included bipolar disorder, posttraumatic stress disorder (PTSD), asthma, migraines, and obesity. (Tr. 21.)

### A.    Education and Employment Background

Ramirez has a high school degree and has completed 3 years of college education. (Tr. 51, 139.) Prior to the alleged onset date, Ramirez worked for a couple of years shelving books as a library page, then for fourteen years as a payment service representative for the Chicago Department of Revenue. (Tr. 58-59, 151.) On January 14, 2008, Ramirez was placed on administrative leave from her job at the Department of Revenue after displaying violence in the workplace, and later that month she was discharged from her position. (Tr. 208.)

### B.    Medical Evidence

Relevant to this appeal are Ramirez's complaints of asthma and migraine headaches, and her treatment for bipolar disorder. At the time of the hearing, Ramirez lived in an apartment with her 8 month old child. (Tr. 49.) She testified that she relied heavily on the assistance of her sister to cook and clean for her on a daily basis due to her medical conditions. (Tr. 53.)

#### 1.    Asthma

On October 13, 2009, Ramirez went to the emergency room for an acute exacerbation of her asthma, and was discharged the following day after medication made her feel "markedly better," and she was instructed to followup with her primary care physician in regards to getting a steroid inhaler. (Tr. 231, 237, 242-43.) On April 27, 2010, Ramirez was again seen in the

emergency room for shortness of breath, at which time it was noted she was out of meds. (Tr. 258.)  Tests showed her lungs were clear (Tr. 263), she was diagnosed with asthma, and discharged the same day. (Tr. 225.)  On August 3, 2010, Ramirez underwent pulmonary testing at St. Catherine, where her asthma was later assessed by state agent Dr. Whitley as being non-severe.  (Tr. 354-361.)  This opinion was affirmed by state agent Dr. Mangala Hasanadka on November 17, 2010. (Tr. 457.)

Ramirez's records and testimony indicate she was seen in 2011 at the Hammond Clinic about every three months for asthma problems.  Her trouble with asthma is also documented in her various mental health treatment records. (Tr. 56-57, 467-479.)  It was noted that cold weather, exercise, heat, humidity, and stress triggered her asthma, and Ramirez testified that she could not climb stairs without becoming winded.  Ramirez took asthma medication, including Advair, Singulair, and Proventil which were listed in her prescription records.  (Tr. 57, 624, 627-628.)

2.    *Migraine Headaches*

Ramirez has seen neurologist Shahida Ahmad, M.D. for her migraine headaches since as early as 2004 (Tr. 608-610.)  In June 2006, he ordered her to stay home from work for approximately twelve weeks due to the side effects from her medication for headaches and bipolar disorder. (Tr. 599.)  She was then told to remain off of work another month due to her persistent and severe migraines.  (Tr. 598.)  Psychiatrist Jayachandran also certified that Ramirez was under his care for the treatment of bipolar disorder and indicated that she was totally incapacitated from early June through September 2006. (Tr. 600.)

On August 24, 2009, Ramirez visited Dr. Ahmad with complaints of an increased number of headaches, occurring almost daily, with severe attacks occurring 3-4 times a month and

lasting 2-3 days. (Tr. 217.) Due to not having insurance and an inability to find work, Dr. Ahmad noted Ramirez was unable to get Topamax or Wellbutrin.

On February 22, 2010, Ramirez visited Dr. Ahmad with complaints of an increased number of headaches, this time with pain in her temples and in the back of her head. (Tr. 482.) On both occasions, Dr. Ahmad prescribed Topamax. (Tr. 217, 482.) It was again noted that Ramirez was not able to get her Topamax due to financial difficulties, but once she started taking it again she felt a little better. (Tr. 482.) Dr. Ahmad documented that Ramirez denied any significant problems with her bipolar disorder, and was currently taking Abilify, Seroquel, Wellbutrin, and Topamax daily, and Maxalt infrequently. An MRI study of Ramirez's brain presented no abnormalities except paranasal sinusitis. (Tr. 220.)

In July 2010, reviewing state agent J. Chilton found that Ramirez complained of asthma and migraines, but neither met a listing nor were considered a severe impairment. (Tr. 343.)

On March 12, 2011, Ramirez was evaluated at Community Hospital when she experienced severe headaches after the delivery of her baby. (Tr. 485.) Dr. Anthony Gentile, M.D. noted that her headaches were not typical of post-epidural headaches, prescribed Topamax, and recommended that she followup with Dr. Ahmad. (Tr. 485.) A CT scan of her brain was normal. (Tr. 500.)

In May 2011, Ramirez returned to the care of Dr. Ahmad who noted that Ramirez was experiencing ongoing headaches, and appeared mildly depressed and withdrawn. (Tr. 480-481.) He advised Ramirez to continue taking Topamax and see her psychiatrist as soon as possible.

In July 2011, Ramirez was referred to the Hammond Clinic Specialty Center for her ongoing migraines which were noted as worse since Ramirez had her child. (Tr. 458-479.) She was given Butalbital and Topamax.

Relative to the limitations caused by her migraine headaches, Ramirez testified at the hearing that she needed to take naps during the day and found it difficult to sit, stand, and walk for long periods of time. (Tr. 61.)

### 3. Bipolar Disorder

Between July 2009 and October 2010, Ramirez had biweekly and then monthly therapy sessions at the Regional Mental Health Center, where she had consultations with psychiatrist Dr. Anissa Rivers and Dr. Eugene Kang, M.D. (Tr. 286-323, 393-455.)

In her July 2009 intake report, Dr. Rivers diagnosed Ramirez with bipolar disorder (moderate, acute, chronic) and PTSD (mild, acute, chronic). (Tr. 393-394.) Dr. Rivers also noted that Ramirez had previously been treated for bipolar disorder for several years by another therapist and psychiatrist. Dr. Rivers opined that Ramirez's current Global Assessment of Functioning (GAF)[1] score was 51. (Tr. 286, 399, 403.)

Throughout Ramirez's therapy sessions, it was noted that Ramirez appeared depressed and tired, tended to isolate herself, and had to practice coping with stress and anger, although some improvement was reported with continued therapy and medication. It was also reported that in dealing with her mental issues Ramirez was doing better at some sessions than others. In addition, her ongoing physical problems with asthma and migraine headaches were repeatedly documented.

---

[1]A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-Text Revision (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Ramirez's appeal, GAF scores were in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited Oct. 20, 2014). A GAF score of 51-60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

In October 2009, it was documented that Ramirez had been depressed for four years, and her depression was becoming progressively worse over the last year. Although she was previously seeing a psychiatrist for two years, once terminated from her job she had no insurance to cover the cost of therapy. Ramirez reported mood swings marked by sadness and crying, and noted that she was stressed about not having a job. She also explained that she previously had a lot of problems at work, such as confrontations with coworkers, and that she was terminated as a result. Dr. Kang assigned Ramirez a current GAF of 55.

On June 9, 2010, Dr. Rivers completed a "report of psychiatric status" and indicated she had been seeing Ramirez biweekly for bipolar disorder since July 2009. (Tr. 278.) Dr. Rivers reported Ramirez's diagnoses of bipolar disorder, PTSD, asthma, and migraines, and assigned Ramirez a GAF score of 51. (Tr. 278.) Dr. Rivers documented that Ramirez previously saw Dr. Jayachandran, a psychiatrist, and therapist Cynthia Schiller from 2005-2007, and noted that she underwent previous treatment as a child. Dr. Rivers also noted that Ramirez consistently expressed a depressed mood, was frequently agitated, became upset when criticized, cried when speaking of her relationship with her mother and sister, and was often fatigued. (Tr. 279.) Due to Ramirez's mental condition, Dr. Rivers opined that Ramirez would have problems with reacting to co-workers, supervisors, and the public, and she would have difficulty maintaining concentration and consistency with attendance and attending to tasks. (Tr. 282.) Dr. Rivers indicated that Ramirez's condition was "chronic," but opined that she may be able to improve coping and functioning skills in 1-2 years. Although Ramirez's Abilify was discontinued, she continued to take Wellbutrin.

On June 14, 2010, Dr. Kang reported that Ramirez was experiencing more sadness and less energy and motivation. (Tr. 319-320) He also noted that Ramirez was not completing

household chores at the time, rather her boyfriend was taking care of the chores.  Dr. Kang increased her dose of Wellbutrin, but still gave Ramirez a current GAF rating of about 55-60.

 On July 27, 2010, Dr. Kang indicated that Ramirez had a current GAF score of "about 55-60" and listed her diagnoses as bipolar disorder, depression, asthma, migraines, and relationship issues.  (Tr. 440.)  In August, Ramirez stopped using her medications after learning she was pregnant.  Dr. Kang assigned Ramirez a GAF score of 60, and in subsequent sessions it was noted that Ramirez appeared happier when speaking about her pregnancy.

In July 2010, state agency non-examining psychologist Dr. Benetta E. Johnson prepared a mental residual functional capacity assessment of Ramirez.  (Tr. 325-327.) Dr. Johnson determined that Ramirez was moderately limited in her ability to work in coordination with others, interact appropriately with the public, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Johnson also completed a psychiatric review technique form, finding that Ramirez suffered from bipolar disorder and PTSD, which resulted in her having a moderate degree of limitation with respect to maintaining social functioning and concentration, persistence, or pace.  (Tr. 338-339.)  Dr. Johnson further noted that Ramirez's GAF score of 51 did not appear to fully capture Ramirez's reported functioning, and believed Ramirez was capable of performing unskilled work with limited social interaction.  (Tr. 327.)  On November 9, 2010, state agent psychologist Kenneth Neville reviewed the file and affirmed the July 2010 assessment.

In October 2010, Ramirez expressed her concerns about experiencing postpartum depression, and the need to resume medications after her pregnancy. (Tr. 575-589.)  After canceling two appointments in November, Ramirez requested to be discharged from therapy

despite continuing to have depressive symptoms, because her pregnancy was high risk and she was having difficulty getting around on account of her increased physical problems. Ultimately, Dr. Rivers discharged Ramirez with a GAF score of 51 and it was expected that she would return to treatment after the birth of her child.

In April 2011, Ramirez had to cancel her return to therapy due to a doctor's appointment for her infant. (Tr. 530-574.) In May 2011, there was difficulty confirming Ramirez's insurance information in order to reopen her case, which then didn't take place until June 14, 2011. Her therapy resumed with diagnoses of PTSD and bipolar disorder, and an assigned GAF score of 60. At the time, Ramirez was taking Fioricet and Topamax for migraines, Wellbutrin for depression, Librium for panic attacks, and Advair and Albuterol for asthma. During her intake session, Ramirez reported to having been terminated in 2008 after having an anger outburst at work. Dr. Rivers indicated that biweekly therapy sessions were needed, otherwise Ramirez may have difficulty maintaining stable relationships and problems with managing affect.

In August, Ramirez starting taking Abilify again, in addition to Librium, Topamax, Advair, Singular, Fioricet, and her inhaler. In September, it was noted that Ramirez was having significant trouble sleeping, significant trouble with anxiety and depressive symptoms, and significant trouble with familial relationships. Dr. Rivers also noted that Ramirez had regressed in all of her problem areas, and assigned Ramirez a GAF score of 55. On October 4, 2011, Dr. Rivers reported that Ramirez needed to increase the frequency of her therapy sessions because she had not progressed with respect to her treatment goals as initially observed.

On October 25, 2011, Dr. Rivers completed a mental medical source statement. (Tr. 614-619.) She reported that Ramirez had an increase in depressive symptoms followed by periods of irritability and lack of energy; and Ramirez continued to show frequent anger at others and

experienced fears about family interactions. Dr. Rivers concluded that her "condition appears to be chronic," and noted that Ramirez was taking several medications, including Celexa and Abilify which caused pronounced drowsiness. In addition, Dr. Rivers indicated Ramirez had difficulty thinking or concentrating, decreased energy, persistent disturbances of mood or affect, poor impulse control, and emotional withdrawal or isolation. (Tr. 615.) Dr. Rivers reported that Ramirez was unable to meet the following competitive employment standards: maintaining regular attendance; maintaining attention for two hour segments; working with others without being unduly distracted; accepting and responding to instructions/criticism appropriately; dealing with the stress of semiskilled or skilled work; responding to changes in a routine work setting; and completing a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 616-617.) Dr. Rivers believed that Ramirez's impairments would cause her to miss more than four days of work per month and would last at least twelve months, but she believed Ramirez could manage her own disability benefits if awarded. Dr. Rivers further reported that Ramirez had a current GAF score of 51, with the highest GAF score in the past year being 55. (Tr. 614.)

## C.     Testimonial Evidence

### 1.     Testimony of Ramirez

On November 8, 2011, Ramirez appeared with counsel and testified at a hearing before the ALJ. (Tr. 40.) At the hearing, Ramirez testified that she last worked on January 14, 2008, when she was placed on administrative leave and eventually terminated by the Chicago Department of Revenue. (Tr. 45.) She testified that after her unexpected termination, she collected unemployment benefits for approximately one year, because she still needed to pay bills and purchase medication. (Tr. 46-48.) Ramirez confirmed that once her unemployment

benefits ran out, she did not have another source of income. Ramirez indicated that she did not receive food stamps or Medicaid, and her mother paid the rent for her apartment. (Tr. 48-50.) Moreover, Ramirez testified that she and her husband were in the process of divorcing and that she did not get along with her family except her mother and sister. (Tr. 62.)

Ramirez testified that on a normal day, she takes care of her baby, and she is able to bathe, dress herself, style her hair, and make the bed, but she cannot vacuum because of her asthma. (Tr. 52-53.) She indicated that her sister lives across the street and comes over to do her vacuuming and cooking. (Tr. 53.) Ramirez testified that she generally leaves her house only once every two weeks and she experiences anxiety around people. (Tr. 54.)

Ramirez reported that she gets very lightheaded and dizzy when she walks and that she cannot sit or stand for long periods of time due to her migraines. (Tr. 55, 61.) Ramirez explained that she needs to take naps during the day and her sister helps take care of her baby while she naps. (Tr. 61.) She also testified that she gets winded when climbing stairs and experiences drowsiness as a side effect of her medication. (Tr. 56, 60.) Ramirez confirmed that even when she was working she had to take several sick leaves due to her medications. She also continues to have problems with people even when taking her medications. (Tr. 61.)

     2.     *Testimony of the Vocational Expert*

During the hearing, the ALJ asked the VE to first consider a hypothetical individual of Ramirez's age, education, and past work experience, who had no exertional or postural limitations, but had the following work related limitations: had to avoid places with high levels of dust, gasses, molds, wetness, and other environmental pollutants, and had to have limited interaction with the public and coworkers. (Tr. 65-66.) In response, the VE testified that such an individual could not perform Ramirez's past work as a payment services representative

because of the social interaction aspect, but that she could work as a library page.  (Tr. 66.)  The VE also noted that the she could also perform the semi-skilled job of billing clerk and the unskilled job of general office helper.  (Tr. 66-67.)

Second, the ALJ asked the VE to refine the same hypothetical to someone who could only perform simple, routine, and repetitive work, free of fast paced production requirements, and involving only limited or superficial contact with the public and coworkers.  (Tr. 67-68.)  In response, the VE testified that this hypothetical individual would be able to perform work as an office helper and packing items to be shipped at both the light and medium exertional levels. (Tr. 68.)

Third, the ALJ asked the VE to further refine the same hypothetical to someone who was unable to maintain regular attendance and attention for more than two hour segments; could not work in coordination with or proximity to others or complete a normal workday or workweek without interruptions from psychologically based symptoms; could not accept instruction and respond appropriately to criticism from supervisors, get along with coworkers or peers, respond appropriately to changes in the routine work setting, interact appropriately with the public, maintain socially acceptable behavior, adhere to basic standards of neatness and cleanliness, travel to unfamiliar places, or use public transportation; and could be expected to miss four or more days of work per month.  (Tr. 68-69.)  The VE indicated that such a person would not be able to perform work. (Tr. 69.)

### D.      The ALJ's Decision

In her opinion dated February 23, 2012, the ALJ determined that Ramirez had not engaged in substantial gainful activity since May 5, 2010, the application date (since SSI is not payable until the month after the application is filed per 20 C.F.R. § 416.335).  (Tr. 19-21.)  The

ALJ concluded that Ramirez had severe impairments consisting of bipolar disorder, PTSD, asthma, migraines, and obesity, but that her impairments did not, singly or in combination, meet or equal any listed impairment enumerated in the Listings. (Tr. 21-22.) The ALJ discredited Ramirez's testimony with respect to the limiting effects of her severe impairments and difficulties experienced with associating with others, irritability, depression, mood swings, lack of motivation, chronic headache pain, difficulties breathing, and drowsiness from medications. (Tr. 25-28.) The ALJ found that Ramirez had the residual functional capacity (RFC)[2] to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine, and repetitive work free of fast paced production requirements, no more than limited superficial contact with the public and coworkers, and the need to avoid dust, fumes, gases, and other environmental and pulmonary pollutants. (Tr. 24.) Ultimately, the ALJ concluded that based on this RFC and the VE's testimony, Ramirez was unable to perform any past relevant work but she could still perform a significant number of jobs in the national economy, namely office helper, packager, and light manufacturer. As a result, the ALJ determined that Ramirez was not disabled. (Tr. 33-34.)

### III. Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable

---

[2]Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 416.945(a)(1).

mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citations omitted).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citation omitted). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citation omitted).

Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

# IV.  Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act.  *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability.  20 C.F.R. § 416.920(a)(4).  The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner.  20 C.F.R. § 416.920(a)(4)(iii).  However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis.  20 C.F.R. § 416.920(e).  The claimant has the initial

14

burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Ramirez challenges the ALJ's decision on four grounds: (1) that the ALJ failed to properly analyze Ramirez's credibility; (2) that the ALJ failed to properly analyze the opinion of Ramirez's treating psychologist, Dr. Rivers; (3) that the ALJ failed to consider the combined impact of Ramirez's impairments in the RFC; and (4) that the hypotheticals posed to the VE did not incorporate all of the limitations listed in the RFC, and therefore the ALJ erred by relying on the VE's testimony with respect to the type of jobs that could be performed by Ramirez (since the VE's testimony was ultimately based on flawed hypotheticals).

## A.     Credibility of Ramirez

Ramirez argues that the ALJ failed to properly analyze the credibility of her testimony. Particularly, Ramirez believes that the ALJ failed to considered her motivations for collecting unemployment, and the ALJ improperly discounted her complaints of migraine pain and overlooked the medical evidence supporting Ramirez's asserted limitations. The Commissioner contends that the ALJ properly considered the medical evidence and gave sufficient reasons for finding Ramirez not fully credible. The Court agrees with Ramirez.

Relative to Ramirez's receipt of unemployment benefits, the ALJ placed great emphasis on the conflict caused by Ramirez's collecting unemployment benefits (and trying to find work) while applying for disability benefits. The ALJ relied heavily on this information to diminish Ramirez's credibility. Yet, the ALJ improperly failed to consider Ramirez's motivations for collecting unemployment benefits (and looking for work) when the ALJ discounted her testimony on this basis. Although the Seventh Circuit has noted that a claimant's explanation for

15

seeking unemployment benefits may be relevant in assessing the credibility of her representations to the Commissioner, *Schmidt v. Barnhart*, 395 F.3d 737, 745–46 (7th Cir. 2005), Ramirez testified that she sought unemployment benefits for approximately one year because her termination was unexpected and she had no other source of income, yet had bills to pay and medications to purchase. In addition, the record reflects that Ramirez oftentimes stopped taking her medication and seeking treatment due to a lack of insurance and financial means.

The Seventh Circuit has made clear that employment is not proof of ability to work. *Goins v. Colvin,* 764 F.3d 677, 679 (7th Cir. 2014); *Schmidt*, 395 F.3d at 746 (citation omitted). A desperate person might force herself to work—or in this case, certify that she is able to work and even seek work—but that does not necessarily mean she is not disabled. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). Despite this possibility, the ALJ discredited Ramirez's claims of disabling limitations because she sought work and unemployment benefits—and the ALJ did so without discussing the evidence which indicated that Ramirez lacked any source of income and had mounting financial responsibilities subsequent to her abrupt termination.

Therefore, on remand, the ALJ is to make further inquiry as to why Ramirez sought unemployment benefits and explain how this information affects the credibility finding. *See Richards v. Astrue*, 370 F. App'x 727, 732 (7th Cir. 2010); *Cistrunk v. Colvin*, No. 2:12-cv-82-PRC, 2013 WL 1281824, at *11 (N.D. Ind. Mar. 27, 2013) (on remand "the ALJ shall discuss the impact of Plaintiff's financial hardship in relation to his receipt of early retirement and unemployment benefits.")

16

With regard to Ramirez's stated limitations caused by painful headaches and asthma, the ALJ properly considered the various factors set forth in SSR 96-7p.  However, the ALJ erred when she found Ramirez's statements about her headaches and asthma were not credible because medical evidence was lacking. (Tr. 29.)  In particular, the ALJ stated that Ramirez didn't seek treatment in 2008 with respect to her asthma or migraines, which undercut "the intensity, persistence, and limiting effects" of Ramirez's alleged symptoms, and indicated "an exaggeration" as to Ramirez's testimony regarding the severity of her migraines and asthma. *Id*.

The problem is that the ALJ failed to discuss Ramirez's reasons for not seeking treatment for her health problems during that time frame, despite evidence indicating that Ramirez was indigent and didn't have the funds to obtain needed medical care. *See e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.") (citations omitted); SSR 96-7p ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").  Remember that Ramirez applied for Supplemental Security Income, which is a disability benefit available to persons who have no more than $2000 in cash or the equivalent.  Thus, the ALJ should have explored and discussed Ramirez's reasons for not seeking treatment in 2008 before concluding that Ramirez exaggerated the limiting effects of her physical ailments, *see, e.g., Goins,* 764 F.3d at 680, especially in this case where Ramirez has a history (pre-dating her termination in 2008) of missing work for months at a time on account of her treatment for persistent and severe migraines.

In summary, the ALJ's credibility determination was patently wrong because it discounted Ramirez's testimony and asserted limitations in great part because Ramirez collected unemployment benefits and didn't seek treatment in 2008, without considering Ramirez's lack of financial resources and insurance once terminated in January 2008. Because the ALJ's flawed credibility determination directly affected the ALJ's findings about the extent of Ramirez's limitations and her ability to perform work (as then reflected in the RFC), remand is required.

**B.      Opinion of Dr. Rivers**

The ALJ afforded "little weight" to the medical source statements submitted by Dr. Rivers, Ramirez's treating psychologist. (Tr. 31.) Ramirez argues that the ALJ erred in this respect by failing to provide good reason for not affording Dr. Rivers' opinion controlling weight, and failing to analyze the factors listed in 20 C.F.R. § 416.927 to determine the appropriate weight to afford the opinion of Dr. Rivers. The Commissioner contends just the opposite—that the ALJ did not commit error because she provided numerous reasons for affording Dr. Rivers' opinion little weight, all of which were supported by substantial evidence.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if the opinion is "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2); *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009), *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). "However, 'while the treating physician's opinion is important, it is not the final word on a claimant's disability.'" *Schmidt*, 496 F.3d at 842 (quoting *Books v. Chater*, 91 F.3d 972, 979 (7th Cir.1996)). An ALJ may discount a treating physician's opinion if it "is inconsistent with the opinion of a consulting physician or when the treating

physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt*, 496 F.3d at 842.

If the ALJ is justified in declining to give controlling weight to a treating physician's opinion, the ALJ must give the treating source significant weight or articulate reasons for giving it less weight. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). Specifically, the ALJ must determine what weight the treating physician's opinion is due under the applicable regulations. *Id.*; *see* 20 C.F.R. § 416.927. Where an ALJ does not give a treating physician's opinion significant weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 560 ; 20 C.F.R. § 416.927; *see also* SSR 96-2p. It is error for the ALJ to accept one physician's opinions but not the treating physician's opinions without any consideration of the factors outlined in the regulations. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (finding error where the ALJ failed to determine the weight to give a treating physician's opinion in accordance with Social Security Administration regulations).

Here, the ALJ afforded little weight to the October 25, 2011 opinion of Ramirez's treating psychiatrist, Dr. Rivers, wherein Dr. Rivers opined that Ramirez was unable to meet various competitive employment standards and that Ramirez's impairments would cause her to miss more than four days of work per month. The ALJ discredited Dr. Rivers' October 25 assessment because the ALJ found it to be inconsistent with the overall medical evidence and with Dr. Rivers' previous records. However, the Court finds the ALJ's determination in this respect to be without sufficient support because the ALJ discounted Dr. Rivers' October 25 assessment based on various faulty premises.

19

The ALJ first noted that Dr. Rivers' October 25 assessment was not supported by Ramirez's other treatment records. However, in discussing Ramirez's mental health records, the ALJ never mentioned many of the 2011 medical record notations which in fact supported Dr. Rivers' opinion that Ramirez's mental health was declining. Specifically, as early as June 2011, Dr. Rivers noted that without biweekly therapy, Ramirez would have difficulty maintaining stable relationships and problems with managing affect. In September 2011, Dr. Rivers reported that Ramirez was having "significant" trouble with anxiety and depressive symptoms, "significant" trouble maintaining relationships, and "significant" problems with sleeping. Dr. Rivers also noted that Ramirez had "regressed" in all of her problem areas. And in early October 2011, prior to completing her October 25 assessment, Dr. Rivers reported that Ramirez had not progressed with respect to her treatment goals as initially believed.

Despite Dr. Rivers' documented regression of Ramirez's mental health status in 2011, the ALJ only briefly refers to some of these record facts, and then concludes Ramirez is no more limited than reflected in the RFC. But it was error for the ALJ to gloss over much of the evidence favoring Ramirez and supporting the October 25 assessment of Dr. Rivers, while relying only on the records indicating Ramirez was doing well. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding). The ALJ also never mentioned the medical records which explicitly referenced Ramirez's having sought treatment from another psychiatrist and therapist for two years prior to her termination. In fact, had the ALJ included a discussion of these records, she may have noted that in 2006 Ramirez was deemed totally incapacitated for several months on account of her bipolar disorder. And given these facts, the ALJ's conclusion that

"[t]here is no indication in [Ramirez's] treatment records that she would miss multiple days of work" (Tr. 32) as opined by Dr. Rivers, is clearly contradicted by the record.

Also problematic is the ALJ's discounting of Dr. Rivers' more restrictive October 2011 assessment, merely because various 2009-2010 treatment notes (and phrases) in Dr. Rivers' file indicated that Ramirez was improving in some aspects of treatment. Far from being inconsistent with her earlier treatment notes, Dr. Rivers' October 2011 assessment is supported by the various medical records wherein Dr. Rivers documented Ramirez's ongoing problems. In fact, ever since July 2009, Dr. Rivers consistently opined that Ramirez's mental disorders were "chronic." And although Dr. Rivers' earlier treatment notes reflected hopeful remarks of Ramirez's bipolar and depressive condition, this did not automatically render her subsequent concerns about Ramirez's adjustment invalid. In other words, the ALJ did not account for the fact that a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about a claimant's overall condition. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment."); *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("bipolar disorder is episodic"). And Dr. Rivers' documentation from 2011, reflected her belief that Ramirez had not progressed as once thought. Thus, Dr. Rivers' October 2011 assessment was not inconsistent with other records.

The ALJ also discounted Dr. Rivers' October 2011 opinion because the ALJ was unable to reconcile how Dr. Rivers could believe Ramirez was so restricted in 2011, yet find that Ramirez was able to manage her own benefits. (Tr. 32.) But being unable to manage one's own benefits is not a prerequisite to a finding of disability. For instance, Ramirez was not diagnosed

as being mentally handicap nor noted as being incapable of performing basic math; rather, she suffered from bipolar disorder and PTSD which affected her ability to sustain competitive employment.  The ALJ's reasoning in this respect is simply unsound.

Finally, in declining to give controlling or significant weight to Dr. Rivers, the ALJ failed to correctly consider the factors listed under the applicable regulation. *See Moss*, 555 F.3d at 560; 20 C.F.R. § 416.927; SSR 96-2p.  As Ramirez points out, the ALJ did not directly address the fact that Ramirez was treated for her mental conditions by Dr. Rivers, a psychologist, on a biweekly and monthly basis for over two years. And as discussed in detail above, the ALJ failed to observe the consistency and supportability of Dr. Rivers' opinions with her own treatment records.  Additionally, it was improper for the ALJ to discount Dr. Rivers' opinions because Ramirez did not seek psychological treatment with Dr. Rivers in 2008, without also considering Ramirez's reasons for the lack of treatment. *See Shauger*, 675 F.3d at 696; SSR 96-7p.

In sum, the ALJ has not sufficiently supported her determination that Dr. Rivers' opinion was not entitled to controlling or significant weight as a treating source.  Accordingly, remand is necessary for the ALJ to properly analyze and explain the weight to be afforded to the opinion of Dr. Rivers, who in essence believed that Ramirez was disabled.

**C.     The RFC Determination**

The ALJ must determine an individual's RFC, or "what an individual can still do despite his or her limitations," SSR 96–8p, based upon medical evidence as well as "other evidence, such as testimony by the claimant." *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted).  In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, "even [limitations] that are not severe, and may not dismiss a

22

line of evidence contrary to the ruling." *Id*. (quoting *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)).

Here, the ALJ's flawed credibility determination and insufficiently supported discussion of Dr. Rivers' opinion affected the ALJ's RFC findings about the extent of Ramirez's limitations. Until the ALJ supplies sufficient reason to disbelieve Ramirez and her treating psychiatrist's opinions, the Court is unable to conclude that the RFC is supported by substantial evidence. For purposes of remand, the Court would specifically note that the ALJ failed to properly account for Ramirez's asserted limitations with regard to sitting, standing, and walking, and her asserted need to take naps during the day.

Although there is no medical opinion indicating that Ramirez must take naps, Ramirez testified that she must take naps during the day due to her migraines and that she relied on her sister for assistance during those periods of rest. (Tr. 61.) Ramirez's medical records also evidence her persistent problem with being able to sleep. Despite this evidence, the ALJ dismissed Ramirez's testimony about her need to nap based on the faulty credibility discussion previously detailed. Because Ramirez's testimony and her documented sleep problems were not contradicted by other evidence, on remand, the ALJ must sufficiently explain why Ramirez's unrebutted need for naps does not affect her ability to work. *See Cuevas v. Barnhart*, No. 02 C 4336, 2004 WL 1588277, at *15 (N.D. Ill. Dec. 29, 2004) (the ALJ erred by failing to address unrebutted evidence that claimant needed to take naps during the day); *Holland v. Barnhart*, No. 02 C 8398, 2003 WL 22078383, at *9 (N.D. Ill. Sept. 5, 2003) (by failing to discuss the claimant's fatigue and how it might affect her job performance, the court was precluded from evaluating whether there was substantial evidence to support the ALJ's finding).

Similarly, the ALJ discounted Ramirez's stated limitations with respect to her ability to sit, stand, and walk, and the ALJ ultimately determined that Ramirez was capable of performing a full range of work at all exertional levels. (Tr. 30.) Again, the ALJ's RFC determination was premised on the ALJ's inadequate credibility finding and unsupported discrediting of Dr. Rivers' assessment (that Ramirez was ultimately not able to meet competitive employment standards). As a result, on remand the ALJ must reconsider whether Ramirez would have further limitations, especially with respect to her ability to sit, stand, and walk without breaks/naps, and the ALJ shall explain how Ramirez's credible abilities and limitations were accounted for in the RFC assessment.

## D.     The Hypothetical Questions Posed to the VE

The ALJ found that Ramirez could not perform her past work (step four), but she was able to perform other jobs that existed in significant numbers in the national economy (step five). In deciding what work Ramirez was capable of performing, the ALJ relied on the VE's testimony, which in turn relied on the ALJ's hypothetical questions (that were premised on the ALJ's impression of Ramirez's limitations).

The ALJ is required to incorporate into her hypotheticals those impairments and limitations that she accepts as credible. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Here, the ALJ's insufficiently supported RFC findings about the extent of Ramirez's limitations led the ALJ to ask hypotheticals of the VE based upon only some, as opposed to all, of Ramirez's complaints.[3] Once the ALJ provides adequate support for her RFC findings, which

---

[3]Admittedly, the Seventh Circuit has occasionally assumed a VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health &*

can then be used as the basis of the hypotheticals, then the Court can assess whether a VE's testimony can be relied upon as an accurate indicator for the type of work Ramirez is capable of performing. But because it is the ALJ's duty to assess the weight to be afforded to the record evidence and to determine the claimant's actual limitations and resulting RFC, 20 C.F.R. §§ 416.920(e), 416.945, 416.946(c), steps four and five cannot be properly analyzed in this appeal. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); SSR 96-8p.

On remand, the ALJ should be mindful not to assign an RFC to the claimant which is more restrictive than the hypothetical questions posed to the VE. Specifically in this case, the ALJ's RFC indicated that Ramirez had "to avoid" dust, fumes, gases, and other environmental and pulmonary pollutants, whereas the hypothetical questions posed to the VE only required avoidance of "high levels" of dust, gasses, molds, wetness, and other environmental pollutants. While the jobs ultimately identified by the VE may not involve environmental pollutants, this should be clarified on remand.

## V. Conclusion

For the foregoing reasons, the Court GRANTS Kathleen M. Ramirez's request to remand the ALJ's decision [DE 1.] Accordingly, the Court now REMANDS this case to the Commissioner for further proceedings consistent with this Opinion and Order.

---

*Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the ALJ asked a series of increasingly restrictive hypotheticals that focused the VE's attention on the limitations of the hypothetical person, rather than on the record itself or the limitations of the claimant herself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).

SO ORDERED.

ENTERED: October 31, 2014

                                                /s/ JON E. DEGUILIO

                                             Judge
                                             United States District Court